681 S.E.2d 6

**W. Harold JONES, Appellant,**

v.

**Mandy LEAGAN, Jeff Leagan, James D. Owens
and Helen M. Owens, Respondents.**

No. 4551.

Court of Appeals of South Carolina.

Heard April 22, 2000.

Decided May 27, 2009.

2

4

C. Joseph Roof, of Columbia, for Appellant.

William P. Walker, of Lexington, for Respondents.

PER CURIAM:

In this civil case, we must determine whether the Special Referee erred in holding (1) James and Helen Owens (collectively the Owens) acquired title to a piece of property owned

by W. Harold Jones (Jones) by adverse possession, and (2) Jones' claim of ownership was barred under the doctrine of laches. We affirm.

## FACTS/PROCEDURAL HISTORY

On October 10, 1966, C.W. Metts (Metts) conveyed the real property known as Lot 31 on the Metts Lake Subdivision Plat (Lot 31 or the Lot), along with other property, to Jones for the sum of five dollars. This conveyance was recorded on October 17, 1966, in the Office of the Lexington County Register of Deeds. From the time Jones purchased Lot 31 until 1987, the Lot remained unimproved, uncultivated, and unmarked.

On October 21, 1987, the Owens purchased Lot 31 for $2,000 from Alice P. Shoaf (Shoaf). In the deed, Shoaf stated when Metts conveyed Lot 32 to her by an earlier deed, he did so inadvertently and Metts actually intended to convey Lot 31 to Shoaf.

The Owens claim after purchasing Lot 31 from Shoaf in 1987, they performed several "acts of ownership" on the Lot. These purported acts included (1) having the Lot surveyed in 1987; (2) seasonal bush-hogging and brush burning on the Lot beginning in 1987; (3) putting down a driveway from the road leading onto the Lot in 1987; (4) installing four white-tipped corner posts, each four feet above the ground at the four corners of the Lot in 1987; (5) placing a mesh wire fence with a gate along the back side of the Lot in 1987; (6) installing "No Trespassing" signs on the Lot between 1988 and 1989; (7) using the Lot to store business supplies, such as cement blocks, a tractor trailer, and fallen timber cut from the Lot starting in 1987; (8) installing a mobile home, septic tank, and a well in 1998 and privacy fence in 2000; and (9) paying property taxes on the Lot from 1987 to present. As further evidence of ownership, the Owens assert outside companies twice asked their permission to access Lot 31. The first time was in the 1990s when they were contacted by Corley Brothers Lumber Company (Corley) requesting permission to cut trees on Lot 31. The second instance was in 2000 when South Carolina Electric & Gas (SCE & G) contacted the Owens

requesting permission for an easement to install a power pole on Lot 31.

In 1998, the Owens' daughter, Mandy Leagan, and son-in-law, Jeff Leagan, (collectively the Leagans) moved onto Lot 31 as their residence. In 1998, the Owens conveyed Lot 31 to the Leagans, and eventually in 2004, the Leagans reconveyed Lot 31 back to the Owens for the purpose of securing a loan.

In 2004, after seeing for the first time that "something [was] going on with [Lot 31]," Jones met with an attorney. On May 6, 2005, Jones filed an action in ejectment and trespass to try title and sought to quiet title to Lot 31. In response, the Owens sought title to Lot 31 by adverse possession under color of title and also raised the equitable defense of laches.

A hearing was held before the Special Referee on August 23, 2007. The Owens testified as to all of the acts described above. The Owens also presented copies of the deed from Shoaf as well as tax receipts for Lot 31 However, several of the Owens' purported acts of ownership were not corroborated by any witnesses or documentary evidence. For instance, the Owens claim to have had Lot 31 surveyed, but they presented no plat. Also, the Owens presented neither pictures of nor receipts for the corner posts, the fences, or the "No Trespassing" signs. Furthermore, the Owens presented no witnesses from either SCE & G or Corley to testify as to what research, if any, they conducted before concluding the Owens were the legal owners of Lot 31.

Jones testified several times he had never once been to Lot 31 within the period from 1987 to 2004. Contrary to this, Jones also testified he had been to the Lot twice during that time, once in 1992 to level a road adjacent to Lot 31, and again in 1997 with Lexington County officials. Jones testified he did not see any change in Lot 31 on either of these occasions.

In an order dated November 30, 2007 (the Order), the Special Referee found the Owens to be the owners of Lot 31 by adverse possession and denied Jones' request for ejectment and his action for trespass to try title and barred his claim of ownership under the equitable doctrine of laches. This appeal followed.

## STANDARD OF REVIEW

In this case, Jones filed an action in ejectment, trespass to try title and sought to quiet title to Lot 31. Normally, an action to quiet title to property is an action in equity. *Clark v. Hargrave*, 323 S.C. 84, 86, 473 S.E.2d 474, 476 (Ct.App.1996). However, the character, as legal or equitable, of an action is determined by the complaint in its main purpose, the nature of the issues as raised by the pleadings or the pleadings and proof, and the character of the relief sought under them. *Id.* In their answer to Jones' complaint, the Owens sought title to Lot 31 by adverse possession. The determination of title to real property is legal in nature. *Id.* at 87, 473 S.E.2d at 476. Moreover, an adverse possession claim is an action at law. *Id.* Thus, an action to quiet title to real property, primarily involving the determination of title to real property based on adverse possession, should be characterized as an action at law. *Id.* Because an adverse possession claim is an action at law, the character of the possession is a question for the jury or fact finder. *Miller v. Leaird*, 307 S.C. 56, 61, 413 S.E.2d 841, 843 (1992). Therefore, appellate review is limited to a determination of whether any evidence reasonably tends to support the trier of fact's findings. *Id.*

## LAW/ANALYSIS

### I. Clear and Convincing Evidence of Adverse Possession

Jones argues the Special Referee erred in concluding the Owens proved by clear and convincing evidence that they had acquired title to Lot 31 by adverse possession. We disagree.

When it is asserted by the defendant, adverse possession is an affirmative defense. *Miller v. Leaird*, 307 S.C. 56, 62, 413 S.E.2d 841, 844 (1992). The party asserting adverse possession must show continuous, hostile, open, actual, notorious, and exclusive possession for a certain period of time. *Mullis v. Winchester*, 237 S.C. 487, 491, 118 S.E.2d 61, 63 (1961). In South Carolina, adverse possession may be established if the elements of the claim are shown to exist for at least ten years. S.C.Code Ann. § 15–67–210 (Supp.2008). To meet this burden of proof, the party asserting the claim

must show by "clear and convincing" evidence he has met the requirements for adverse possession. *Davis v. Monteith*, 289 S.C. 176, 180, 345 S.E.2d 724, 726 (1986).

Jones first argues the Special Referee applied the wrong test when he found the Owens had established actual possession of Lot 31 by "ample evidence." Jones asserts the use of this phrase shows the Special Referee failed to apply a clear and convincing standard and instead applied a lower burden of proof. We disagree for two reasons.

First, the Special Referee recited the correct "clear and convincing" standard in the opening of the "Conclusions of Law" section in the part of the Order discussing the principles of adverse possession. The use of the word "ample" was merely part of a statement concluding the portion of the Order pertaining to the actual possession requirement. Second, when the Special Referee found "ample evidence," we believe the word "ample" was merely an adjective to describe the evidence provided by the Owens that sufficiently met the clear and convincing evidentiary standard. *See, e.g., State v. Cutro*, 332 S.C. 100, 110, 504 S.E.2d 324, 329 (1998) ("A review of the record reveals there is ample evidence to uphold the trial court's ruling that the prior bad acts were proven by clear and convincing evidence."); *Berry v. Ianuario*, 286 S.C. 522, 525, 335 S.E.2d 250, 251 (Ct.App.1985) ("We find sufficient evidence in the record ... to meet the 'clear and convincing' evidence standard."). We believe the Order, when read in its entirety, makes clear the Special Referee applied the correct clear and convincing standard to the adverse possession claim.

Jones next argues even if the Special Referee did apply the correct burden of proof, he nevertheless erred in concluding the evidence presented by the Owens was clear and convincing as to the elements of adverse possession. However, given that ours is an "any evidence" standard of review, we disagree.

Acquiring title by adverse possession requires proof of actual, open, notorious, hostile, continuous, and exclusive possession by the claimant, or by one or more persons through whom he claimed, for the full statutory period. *Miller*, 307 S.C. at 61, 413 S.E.2d at 844. As discussed below, we believe the Owens presented evidence establishing each of these requirements.

## A. Actual Possession

Acts of ownership of open land need only be exercised in a way consistent with the possible uses of the land and as the situation of the property permits, without actual residency or occupancy. *Butler v. Lindsey,* 293 S.C. 466, 471, 361 S.E.2d 621, 623 (Ct.App.1987). For the purpose of constituting adverse possession by a person claiming title founded upon a written instrument, land shall be deemed to have been possessed and occupied when it has been "usually cultivated or improved," and when it has been "protected by substantial enclosure." S.C.Code Ann. § 15–67–230 (Supp.2008).

The Owens purchased Lot 31 from Shoaf in 1987 for $2,000, and the deed was recorded at the Lexington County Register of Deeds on the date of the closing. At trial, the Owens testified that between 1987 and 1998, they posted landscape stakes at the corners of the Lot, bush-hogged and landscaped the Lot, graded a driveway leading onto the lot, placed "No Trespassing" signs throughout the Lot, raised a mesh wire fence along the back of the Lot, stored business supplies on the Lot, paid taxes on the Lot, and cut down timber on the Lot. Between 1998 and 2000, a septic tank, a well, and wood privacy fences were installed on the Lot. On the basis of this evidence, the Special Referee held the Owens acquired Lot 31 by adverse possession under color of title.

Jones argues the "first clear act of ownership," if any, exercised by the Owens was the installation of the mobile home, well, and septic tank in 1998. Thus, the Owens' period of actual possession had not reached ten years by the time this action was filed in 2005. As for the Owens' activities prior to 1998, Jones argues the Owens' evidence of these activities did not rise to the level of clear and convincing because their testimony regarding these acts was contradictory and self-serving and was neither supported by documentary evidence nor corroborated by any witnesses.

The Special Referee, as trier of fact, has the task of assessing the credibility, persuasiveness, and weight of the evidence presented. *Evatt v. Campbell,* 234 S.C. 1, 6, 106 S.E.2d 447, 451 (1959). In an action at law, this Court must affirm the factual findings of the Special Referee unless no evidence reasonably supports those findings. *Clark,* 323 S.C.

at 87, 473 S.E.2d at 476. Sworn testimony, albeit self-serving, is still evidence. *Id.* at 90, 473 S.E.2d at 478 (affirming the master's holding that the lot in question had been adversely possessed based, in part, on the testimony of the adverse possessor). In reviewing an action tried at law, it is not the place of this Court to substitute its own view as to the facts. *United Farm Agency v. Malanuk,* 284 S.C. 382, 385, 325 S.E.2d 544, 546 (1985).

Here, the Special Referee found the Owens' testimony credible. Although the Owens' testimony could have been bolstered by corroborating documentary evidence, the Special Referee was convinced of the Owens' claim despite its absence. To the extent the Owens' testimony was contradictory [1] and self-serving, Jones' own testimony was also self-serving and, at times, inconsistent.[2] The Special Referee, as trier of fact, assessed the credibility of the evidence presented by both parties, and we believe his findings are supported by the evidence.

## B. Open and Notorious

 Jones argues the Special Referee erred in concluding the period of the Owens' adverse possession was of sufficient length because prior to 1998, the Owens' activity on Lot 31 did not rise to the level of open and notorious.[3] We disagree.

 While the legal owner need not have actual knowledge the claimant is claiming property adversely, the hostile possession should be so notorious that the legal owner by ordinary

---

1. Jones argues the Owens' testimony was inconsistent because at one point, Mr. Owens testified he had "[no] serious doubts" as to their ownership of Lot 31, but later testified he acquired quitclaim deeds for "further verification," as sort of a "second opinion."

2. Jones testified at times that he had not stepped onto Lot 31 for seventeen years from 1987 to 2004. However, at other times, he claimed to have been to Lot 31 in 1992 and 1997.

3. In his brief, Jones treats the open and notorious requirement of adverse possession as a separate issue, under the sub-heading "The Special Referee erred in his calculation of the respondent's period of adverse claim and the determination of time of appellant's first notice of such claim." We address this under the more general issue of whether the Special Referee erred in finding clear and convincing evidence of each of the elements of adverse possession.

diligence should have known of it. *Graniteville Co. v. Williams*, 209 S.C. 112, 120–21, 39 S.E.2d 202, 206 (1946).

In this case, the Owens performed several acts prior to 1998 that, had Jones exercised ordinary diligence, would have put Jones on notice his land was being possessed by another. Starting in 1987, the Lot was bush-hogged regularly, a driveway and wire fence were installed, timber was cut down, "No Trespassing" signs and property stakes were installed, and business supplies such as concrete blocks, timber, and a trailer were stored on the Lot. All of these acts presumably resulted in physical changes to the Lot that would be visible to a landowner exercising ordinary diligence in the ownership of his property.

Jones presents three arguments as to why the Owens' activities were not sufficiently open and notorious. We believe all three are without merit.

First, Jones argues the Owens' activities on Lot 31 prior to 1998 were insufficiently open and notorious because they were "temporary and transient." In support of this, Jones cites *Getsinger v. Midlands Orthopaedic Profit Sharing Plan*, 327 S.C. 424, 430, 489 S.E.2d 223, 226 (Ct.App.1997), for the proposition "[o]ccasional and temporary use or occupation does not constitute adverse possession," and notes the Owens testified the timber, cement blocks, and trailer were kept on the Lot merely for storage and that these items were never stored on the Lot for very long. However, this argument seems to be directed more towards the continuousness requirement, rather than the open and notorious requirement. We will, therefore, address this argument in the next section.

Next, Jones argues the Owens' activities were not open and notorious because no one lived on Lot 31 and there were no permanent structures on the Lot from 1987 until 1998. However, acts of ownership of open land for purposes of adverse possession need not include actual residency or occupancy. *Butler*, 293 S.C. at 471, 361 S.E.2d at 623. Moreover, activities that do not involve the creation of permanent structures on the land can be sufficiently open and notorious as to put the legal owner on notice that his land is being adversely possessed. *See, e.g., Miller*, 307 S.C. at 62, 413 S.E.2d at 844 (holding evidence supported Special Referee's

finding of adverse possession when respondent paid the mortgages on the property, paid taxes on the property, and marked the boundary lines of the disputed property, and cut and sold timber on the tract in question for the statutory period).

Finally, Jones argues the Owens' activities were not open and notorious because (1) Mrs. Owens testified an observer standing on the Owens' lot across the street from Lot 31 could not have seen the mesh fence in the back of Lot 31, and (2) Mr. Owens testified it was possible an observer might not have been able to see the "No Trespassing" signs. We disagree.

First, the determination of whether possession is open and notorious is made from the viewpoint of the legal owner exercising ordinary diligence, not of the adverse possessor. *Graniteville Co.*, 209 S.C. at 120–21, 39 S.E.2d at 206. Jones asks this Court to determine the open and notorious nature· of the Owens' possession from the viewpoint of the Owens by using Mrs. Owens' testimony as evidence the possession was not open and notorious. Essentially, Jones asks this Court to assume the exercise of ordinary diligence would not require him to view Lot 31 from any closer than the Owens' house across the street. We do not believe ordinary diligence is so limited. Second, even assuming, *arguendo,* both of the Owens' statements above are true, the other acts of ownership (e.g., the bush-hogging, brush burning, and the installation of the driveway) would still suffice to put Jones on notice of the Owens' possession had he exercised due diligence.

### C. Continuous

Jones first contends the Owens' possession of Lot 31 was not continuous because the Leagans' ownership of and residence on Lot 31 from 1998 to 2004 "interrupted" the Owens period of adverse possession. We disagree.

A person claiming adverse possession must have personally held the property for ten years, and tacking is allowed only between ancestor and heir. *Getsinger,* 327 S.C. at 430–31, 489 S.E.2d at 225. During the ten year period, tacking is not allowed between successive occupants. *Id.* If the claimant's period of adverse possession is interrupted,

constructive possession is restored to the owner. *Mullis,* 237 S.C. at 496, 118 S.E.2d at 65.

In this case, Jones argues the Special Referee erred in holding the Leagans were the Owens' "heirs" and their period of residence could, therefore, be tacked onto the Owens' period of adverse possession. On this point, we agree with Jones because the Leagans are not the Owens' "heirs." *See Alley v. Strickland,* 279 S.C. 126, 127, 302 S.E.2d 866, 867 (1983) ("Heirs are not determined until the death of the ancestor in question."). However, the Special Referee's error is irrelevant in light of the fact that the Owens' possession of Lot 31 began in 1987 and continued until at least 1997, at which time they acquired title by adverse possession under the ten year statute of limitations. It was not until 1998 that the Owens deeded Lot 31 to the Leagans. Thus, the Leagan's residence and ownership could not have interrupted the Owens period of adverse possession.

Jones also argues the Owens' possession was "temporary and transient," rather than "continuous," because the Owens testified the timber, cement blocks, and trailer were kept on the Lot merely for storage and these items were never stored on the Lot for very long. We disagree.

Occasional and temporary use or occupation does not constitute adverse possession. *Getsinger,* 327 S.C. at 430, 489 S.E.2d at 226. However, the rule requiring continuity of possession does not mean the person in possession must be actually on the land during the whole of the statutory period. *Mullis,* 237 S.C. at 495, 118 S.E.2d at 65. "Actual possession, once taken, will continue, though the party taking such possession should not continue to rest with his foot upon the soil, until he be disseised, or until he [does] some act which amounts to a voluntary abandonment of the possession." *Id.* In determining whether continuity of possession is broken, the nature and location of the land should be considered and whether the use to which the land has been put comports with the usual management of such property. *Id.*

In this case, the fact the trailer and building supplies were not stored on Lot 31 for very long does not mean the Owens' possession was "occasional and temporary." Mr. Owens is in

the landscaping business and he used Lot 31 as storage for his supplies. In the course of running a landscaping business, presumably the trailer is brought along to job sites along with building supplies. It is, therefore, understandable his trailer would occasionally be absent from the lot. The same holds true for his building supplies such as timber, bricks, and cement blocks. As supplies get used, new ones come in, such that no one set of blocks, bricks, or timber would remain on the Lot for long.

Furthermore, the fact that the presence of the trailer and building supplies may not have been continuous does not undo the fact the other acts of ownership were. The Owens testified they seasonally bush-hogged the Lot, burned brush on the Lot, put up a mesh wire fence, and installed "No Trespassing" signs. Taken together, we believe the evidence presented supports the Special Referee's finding of continuous possession.

Accordingly, we believe the Owens have met the requirement of continuous possession of Lot 31.

### D. Exclusive and Hostile

Jones does not dispute the Special Referee's findings as to these two elements of adverse possession. An issue that is not argued in the brief is deemed abandoned and precludes consideration on appeal. Rule 208(b)(1)(D), SCACR; *Jinks v. Richland County*, 355 S.C. 341, 344 n. 3, 585 S.E.2d 281, 283 n. 3 (2003). Accordingly, any argument regarding exclusivity or hostility is abandoned.

### II. Burden of Proof

Jones argues the Special Referee impermissibly shifted the burden of proof to him "by promulgating a series of acts a landowner must seemingly perform to give notice to the world of ownership." We disagree.

In an action to quiet title, the burden of proof is on the party asserting adverse possession as an affirmative defense. *Clark*, 323 S.C. at 87, 473 S.E.2d at 476. The Special Referee recited this principle of law at the outset of the "Conclusions of Law" section of the Order. Nevertheless, Jones argues the Special Referee placed the burden of proof

on him to establish ownership by some set of affirmative acts. In support of this, Jones points to certain findings of fact by the Special Referee as evidence the Special Referee implicitly required more of Jones than is normally required in a quiet title action. For instance, the Special Referee noted Jones had left Lot 31 "unimproved, uncultivated[,] and unmarked" and "untouched as an investment." He further noted Jones "neglected to perform any act whatsoever to give notice to the world that he was the owner of Lot 31."

We believe these findings of fact speak only to what Jones did and did not do with Lot 31, not what he should have done or what he was required to do under the law. While evidence of affirmative acts of ownership by Jones might have made it more difficult for the Owens to meet their burden, nothing in the Order suggests the Special Referee required Jones to produce evidence of such acts to succeed in his quiet title action. We also believe these findings of fact are relevant to the defenses raised by the Owens. The fact Jones had not made any use of Lot 31 was relevant to the question of whether the Owens' use of Lot 31 was exclusive for purposes of adverse possession. *See Butler*, 293 S.C. at 472, 361 S.E.2d at 624 ("The exclusive possession necessary to acquire title by adverse possession is not satisfied if occupancy is shared with the owner or with agents of the owner."). Also, the fact that Jones had not visited Lot 31 for seventeen years was relevant to the question of Jones' due diligence on both the laches defense, as discussed below, and the open and notorious requirement of adverse possession. *See Jefferson Pilot Life Ins. Co. v. Gum*, 302 S.C. 8, 11, 393 S.E.2d 180, 181 (1990) (holding laches is neglect for an unreasonable and unexplained length of time, under circumstances permitting diligence, to do what in law should have been done); *Graniteville Co.*, 209 S.C. at 120–21, 39 S.E.2d at 206 (holding possession should be so notorious that the legal owner by ordinary diligence should have known of it).

Jones also criticizes the Order to the extent it implies "owning a piece of property for purposes of leaving it undeveloped is not enough for a record owner to maintain an interest in his property." Certainly, owning property as an investment with a duly recorded, valid instrument of title will suffice for a landowner to be able to claim proper legal title and ownership

in many instances. However, the mere fact a landowner holds valid record title does not immunize the landowner from claims of adverse possession. It is possible such a landowner, despite his superior title, could nevertheless be divested of his right to title if an adverse possessor successfully establishes his claim. *See Clark,* 323 S.C. at 90–91, 473 S.E.2d at 478 (holding even though Clark held superior record title over adverse possessor to the land in question, that fact alone could not divest one who properly acquired title to the land by adverse possession); *Sumner v. Murphy,* 20 S.C.L. (2 Hill) 488 (1834) (finding a showing of adverse possession of land for the time prescribed by the statute of limitations practically extinguishes the right of the party having true paper title and vests a perfect title in the adverse possessor).

■■■ Jones also assigns error to the Special Referee's failure to make a finding as to which party held legal title to Lot 31. However, the Owens did not offer their instrument of title for its superiority over Jones' deed. Rather, their deed was offered in support of their color of title claim. "A deed may be color of title although the grantor was without interest or title in the land conveyed." *Mullis,* 237 S.C. at 495, 118 S.E.2d at 63. Thus, the validity of the Owens deed is irrelevant to an adverse possession claim. Accordingly, the Special Referee did not need to determine which party held superior record title on the basis of their competing instruments. See id. ("The extent of the occupant's claim founded on an instrument of writing is not dependent upon the validity of such instrument.").

We, therefore, find no error in the Special Referee's failure to determine which party held legal title to Lot 31.

### III. Laches

■■ Jones argues the Special Referee erred in applying the equitable doctrine of laches to this case or, if laches is applicable, in misconstruing its application. We disagree.

■■■ Courts have the inherent power to do all things reasonably necessary to ensure that just results are reached to the fullest extent possible. *Ex Parte Dibble,* 279 S.C. 592, 595, 310 S.E.2d 440, 442 (Ct.App.1983). The equitable doctrine of laches is defined as "neglect for an unreasonable and

unexplained length of time, under circumstances affording opportunity for diligence, to do what in law should have been done." *Hallums v. Hallums,* 296 S.C. 195, 198, 371 S.E.2d 525, 527 (1998). The party seeking to establish laches must show (1) delay, (2) that was unreasonable under the circumstances, and (3) prejudice. *Kelley v. Kelley,* 368 S.C. 602, 606, 629 S.E.2d 388, 391 (Ct.App.2006). To establish laches as a defense, the defendant must show the complaining party unreasonably delayed its assertion of a right, thereby prejudicing the defendant. *Id.* "[T]he determination of whether laches has been established is largely within the discretion of the trial court." *Id.* at 607, 629 S.E.2d at 391. Additionally, for the defense of laches to be sustained, "the circumstances must have been such as to import that the complainant had abandoned or surrendered the claim or right which he now asserts." *Id.* (quoting *Byars v. Cherokee County,* 237 S.C. 548, 560, 118 S.E.2d 324, 330 (1961)).

In this case, Jones testified he did not visit Lot 31 for the seventeen years between 1987 and 2004. This delay was unreasonable under the circumstances because Lot 31 is located in the same county where Jones is a resident. Thus, visiting Lot 31 should not have presented any great difficulty for Jones. Furthermore, the Owens would be prejudiced if they were ejected from Lot 31 because they have invested a substantial amount of time and money into Lot 31, whereas Jones has invested practically nothing. The Owens purchased Lot 31 in good faith from Shoaf and had no knowledge of Jones' potential claim of ownership. Because Jones was in a better position to protect himself and avoid the issue now facing the Court, we believe the equities favor the Owens.

Accordingly, we find no error in the Special Referee's application of laches.

### IV. Admission of Hearsay Evidence

 Jones argues the Special Referee erred by giving significant credibility and weight to testimony by the Owens that they had numerous title searches performed because Owens offered no documentation to support this. However, Jones has cited no legal authority to support the argument that this was an error of law. As such, this argument is

conclusory, and such arguments are deemed abandoned on appeal. *See Mulherin–Howell v. Cobb,* 362 S.C. 588, 600, 608 S.E.2d 587, 593–94 (Ct.App.2005) (finding party abandoned an issue on appeal due to failure to cite any supporting authority and making only conclusory arguments).

## CONCLUSION

Accordingly, the Special Referee's decision is
**AFFIRMED.**

HUFF, WILLIAMS, and KONDUROS, JJ., concur.